IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | : |
| | : |
| **V.** | : No. 14-412-05 |
| | : |
| | : |
| **LINWOOD NORMAN** | : |

**ORDER**

     **AND NOW**, this      day of August , **2014**, it is hereby **ORDERED** that **Linwood Norman** is released from custody pending trial in this matter subject to the following conditions:

    1.

    2.

    3.

    4.

    5.

Additional:

                                         **By the Court:**

                                       _____

                                       **U.S. Magistrate Judge Richard A. Lloret**

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | : |
| | : |
| V. | : No. 14-412-05 |
| | : |
| | : |
| **LINWOOD NORMAN** | : |

## MOTION FOR PRETRIAL RELEASE

**AND NOW**, Linwood Norman, by and through his attorney, Nicholas V. Pinto, hereby submits the following motion for pretrial release and/or in opposition to the Government's motion for pretrial detention:

1. Undersigned counsel, a CJA Panel Attorney, has been appointed to represent Linwood Norman in the above-captioned matter.

2. A twenty-six count indictment was returned by a federal grand jury on July 29, 2014 charging six Philadelphia Police Officers with various federal crimes.

3. The government has moved for permanent pretrial detention pending trial for of all six of the charged Philadelphia Police Officers.

4. Linwood Norman has been charged with a violation of 18 U.S.C. § 924 © which triggers a rebuttable presumption under the provisions of 18 U. S. C. § 3142 - Release or Detention of a Defendant Pending Trial that "no condition of release, or combination of conditions, will reasonably assure the appearance of the defendant as required and the safety of other persons and the community."

5. However, the criminal violation, (924 ©), which is the basis for triggering the rebuttal presumption for permanent pretrial detention is totally absent from the charging document as to Linwood Norman.  Further, no reasonable reading of the facts described in the indictment concerning the episodes in question could led one to believe that these thefts took place at gunpoint.  *The rebuttable presumption standard should not be applied to Linwood Norman's in this Pretrial Detention matter*.

6. If a rebuttable presumption did apply, Mr. Norman carries the burden of production to come forward with evidence to rebut the presumption but that obligation does not shift the burden of persuasion to defendant which remains with the government." See United States v. Perry, 788 F.2d 100, 114 (3d Cir.1986) and United States v. Abdullahu, 488 F. Supp.2d 433, 438 (D.N.J. 2007).

7. Although the government declares "the evidence in this case is strong", A comparative review of the indictment and the Motion for Pretrial Detention reveals glaring and significant inconsistencies which cast a substantially different light on the "evidence" and the strength of the government's argument for permanent detention and/or for the underlying basis for the basis of the triggering violation. This is especially true considering that the indictment is essential based on the testimony of one Jeffrey Walker who a convicted felon and, now, pitchman for a book about his life and career, who was caught red handed executing one of his rogue schemes to steal money from drug dealers.

8. Despite the government's allegations, Mr. Norman's innocence is still to be presumed as set forth in 18 U.S. C. § 3142(j) Presumption of Innocence which states that "Nothing in this section shall be construed as modifying or limiting the presumption of innocence.

9. The totality of the circumstances under 3142(g) must be considered before determining whether permanent detention is appropriate whether or not there is presumption for same.

10. For the reasons stated herein together with the facts and legal argument to be presented at Linwood Norman's August 4, 2014 Detention Hearing, the presumption of detention shall be demonstrated to be clearly rebutted.

**WHEREFORE**, for all of the foregoing reasons, we respectfully submit that Linwood Norman should be ordered released pending trial subject to reasonable conditions of bail.

**Respectfully submitted**,

*/s/ Nicholas V. Pinto*
**Nicholas V. Pinto**
**Attorney for Linwood Norman**

# IN THE UNITED STATES DISTRICT COURT FOR
# THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | : |
| | : |
| V. | : No. 14-412-05 |
| | : |
| | : |
| **LINWOOD NORMAN** | : |

## MEMORANDUM OF LAW

AND NOW, Linwood Norman, by and through his attorney, Nicholas V. Pinto, hereby submits the following:

**VOLUNTARY SURRENDER**

On July 30, 2014, the United States Attorney for the Eastern District of Pennsylvania unsealed the aforementioned twenty-six indictment charging six Philadelphia Police Officers with committing various federal crimes. The investigation leading to the indictment was well known to have been proceeding both in legal circles and in the police community for a significant period of time prior to the July 30, 2014 unsealing of the indictment. Mr. Norman did not flee or commit any crimes during this time and he voluntarily surrendered at his home to federal agents upon learning that charges were being brought against him.

**HISTORY AND CHARACTERISTICS OF LINWOOD NORMAN**

Linwood Norman is a lifetime resident of the City of Philadelphia where he has both close family and community ties. He graduated from Overbrook High School and shortly thereafter joined the Philadelphia Police Department in 1989. During his time with the Police Department he has earned two awards for Bravery/Heroism while putting his life on the line during two shootouts. Mr. Norman lives at 2633 N. 23rd Street with his fiancee, Tracy Duckett, a SEPTA driver in the same neighborhood in which he grew up. His mother, Maureen, (widowed) and sister, Tasha, a Philadelphia Police officer, live next door at 2631 N. 23rd Street live next door. His sister, Michelle, a SEPTA supervisor, lives close by in Folcroft, Pennsylvania.

Mr. Norman is vice president of the Proper Image Truck Club , a nonprofit organization, which, participates in clothing drives for the homeless and needy, fund raises for back-to-school supplies for kids and youth sports organizations; packs food goods for Philabundance; and, has holds fund raisers to provide for families during times of personal crisis. His fiancee, Tracy Duckett, is also a member of that organization.  In addition, he is a volunteer with the Simon Gratz High School Bulldog Nation Association along with his sister, Tasha, which conducts fund raisers to sponsor scholarships for students involved in athletic activities.

Linwood Norman is a family man who has a very positive influence in his neighborhood and community.

**THE STRENGTH OF THE ALLEGATIONS AGAINST LINWOOD NORMAN**

The indictment alleges twenty-two (22) "episodes" in support of the charges brought against the six defendants.  *Linwood Norman is named as a participant in only four (4) of these twenty-two (22) episodes.*  The government makes reference to these four episodes in its motion for pretrial detention but, critically as it affects the government's Motion for Pretrial Detention,  inaccurately includes the use of a firearm as a fact in three of the episodes and does not mention the use of a firearm in the fourth.  They are summarized as follows:

**Episode #4**

The government cites this episode as Linwood Norman's most egregious conduct. It involves a criminal defendant identified as "M.C." whose name is now well know and an article chronicling the arrest can be readily found in an online search on Philly.com.

By all accounts, M.C. was distributing AK47, a potent type of marijuana, reportedly so strong that some users have been treated in emergency rooms for overdoses.  The FBI, Philadelphia Police, Montgomery County Police and Maryland Police found 16 pounds of AK47 valued at over $800,000.00 in M.C.'s penthouse suite.  Also seized were 12 pounds of hallucinogenic mushrooms worth approximately $600,000.00 and in excess of $400,000.00 in cash.  The operation was described in the aforementioned article by then  Philadelphia Police Narcotics Chief Inspector William Blackburn as "[A] large-scale smuggling operation, the drugs came up from South America, down from Canada, and went through New York to reach this area". According to Blackburn the Narcotics Field Unit started with an investigation a month before the raid conducted by a team headed by Officers Tom Liciardello, Jeff Walker and Brian Reynolds. Coordinated controlled buys, surveillance and intelligence gathering followed.

The indictment contains none of this information. It is beyond question that M.C. was arrested with probable cause. In the face of the presence and participation of so many enforcement supervisors and other law enforcement agencies in the investigation, it is difficult to believe that Officer Linwood acted as alleged with no report of these actions by any of the participating agencies.

***There is no allegation of the use of a firearm in this episode in the Motion for Pretrial Detention or the indictment.***

### Episode #9

The conduct alleged in this September 6, 2009 episode involved the arrest of O.R. during which Jeffrey Walker took possession of three of the four kilograms of cocaine that Linwood Norman and Jeffrey Walker, acting in their capacity as Philadelphia Police Officers, had seized from O.R. It is further alleged that after the arrest of O.R. was processed that Jeffrey Walker took the three kilograms of cocaine to his house and to conceal the theft from authorities, prepared police paperwork on the arrest of O.R. that falsely reported that he and Linwood Norman had arrested O.R. in possession of one kilogram of cocaine and failed to report that they had stolen three additional kilograms of cocaine from O.R.
Finally, it is alleged that Jeffrey Walker subsequently gave the three kilograms of cocaine to defendant Linwood Norman so that he could sell them and that after selling the cocaine, Linwood Norman gave $17,000 to Walker, representing his share of the proceeds from the sale of the three kilograms of cocaine.

***There is no allegation of the use of a firearm in this episode in the indictment.***
Only in the government's Motion for Pretrial Detention do we now have this theft event as occurring at gunpoint. It is difficult to believe that such an important fact was omitted in the indictment, a document months in the making.

### Episode #14

The conduct alleged in this March 23, 2010 involved the search of the house of C.T. during which Linwood Norman and Jeffrey Walker, acting in their capacity as Philadelphia Police Officers, seized and split between themselves approximately $20,000 that they found in a second floor bedroom. Mr. Norman was then alleged to later have authored a Philadelphia Police Department 75-52 falsely stating that only $1,000 cash had been seized from C.T.'s property. Apparently, a search warrant was issued and executed to legal entry into C.T.'s house but such facts are omitted from mention in the indictment.

***There is no allegation of the use of a firearm in this episode in the indictment***. Only in the government's Motion for Pretrial Detention do we now have this theft event as occurring at gunpoint. It is difficult to believe that such an important fact was omitted in the indictment, a document months in the making.

**Episode #16**

The conduct alleged in this June 30, 2010 episode involved the search of the house of K.W. during which Thomas Liciardello, Michael Spicer, Perry Betts and Linwood Norman, acting in their capacity as Philadelphia Police Officers, discovered and seized approximately $16,200.00 in cash from a bedroom on the property.

***There is no allegation of the use of a firearm in this episode in the indictment***. Only in the government's Motion for Pretrial Detention do we now have this theft event as occurring at gunpoint. It is difficult to believe that such an important fact was omitted in the indictment, a document months in the making.

The criminal violation (924 © which is the basis of for triggering of the rebuttal presumption for permanent pretrial detention is totally absent from the charging document as to Linwood Norman. Further, no reasonable reading of the facts described in the indictment concerning the episodes in question could led one to believe that these thefts took place at gunpoint.

**PRETRIAL DETENTION -  A TOOL USED BY THE GOVERNMENT**

If Mr. Norman is detained pending trial, he will without doubt be housed under extremely restrictive conditions, that is, he will be held in isolation, solitary confinement, in the Federal Detention Center's Special Housing Unit for 23 hours a day.  This type of housing is, in most instances, used  to punish inmates. In the case of these six Philadelphia police officers, solitary confinement will be used to protect them from attack other inmates. This distinction makes no difference in the obstacles created by this type of punitive incarceration.

Representing an inmate housed in the Federal Detention Center's Special Housing Unit is extremely difficult and places virtually insurmountable obstacles in the path of providing constitutionally sufficient representation for a criminal defendant in the case at bar.  Legal visits are set up in a locked room with a physical barrier between client and attorney which causes each to have to use raised voices to communicate. In addition, paper documents cannot passed between client and attorney to review and there is no access to a computer which is typically used to aid in discovery review in a complex case as this is sure to be. Further, it is

anticipated that a joint defense may be employed which would require joint defense meetings with attorneys and clients that are not possible if they are housed in the Federal Detention Center's Special Housing Unit.

The problems inherent in obtaining justice for an accused who is denied release are summarized in this recent essay appearing in The Yale Law Journal:

> Moreover, the current pretrial system produces false convictions in addition to training real criminals. In the mid-1960s, the Manhattan Bail Project led by the Vera Foundation concluded that "a person's inability or unwillingness to post bail may result in more than a temporary deprivation of his liberty,"[1]42 finding that those detained pretrial were more likely to be convicted and imprisoned than those released on bail, regardless of whether they had been previously charged or imprisoned.[2]43 This trend has continued, leading some to conclude that "[t]he most glaring concern of the pretrial detainee is the large percentage of detainees who are eventually found guilty."[3] While this could simply suggest that judges assessing flight risk and dangerousness are also accurately predicting guilt, further research suggests several other likely contributors to this trend, which are troubling from an equality perspective—and, of course, with respect to defendants' long-term liberty interests. One factor is the substantial difficulty faced by a pretrial detainee attempting to mount a successful defense from a jail cell.[4] The defendant must recruit friends or family members to collect evidence and witnesses and will often have difficulty communicating with his attorney due

---

[1]Anne Rankin, The Effect of Pretrial Detention, 39 N.Y.U. L. Rev. 641, 641 (1964); see also Charles E. Ares, Anne Rankin & Herbert Sturz, The Manhattan Bail Project: An Interim Report on the Use of Pre-Trial Parole, 38 N.Y.U. L. Rev. 67 (1963) (describing the Manhattan Bail Project).

[2]Rankin, supra note 1, at 648.

[3]Douglas J. Klein, Note, The Pretrial Detention "Crisis": The Causes and the Cure, 52 J. Urb. & Contemp. L. 281, 293 (1997); see also Manns, supra note 36, at 1972-73 (pointing to "[n]umerous empirical studies"—most from the 1970s or 1980s—showing the longer the period of pretrial detention, the higher the likelihood of conviction, "even after controlling for factors such as the seriousness of the charges" and "prior convictions"); Phillips, supra note 2, at 2-7, 56 (reviewing the literature finding a link between pretrial detention and case outcomes, and, in an empirical analysis of defendants in New York City detained and released in 2003-2004, finding that "detention to disposition" was "one of the most important single factors" that influenced the "likelihood of conviction"); Thomas E. Scott, Pretrial Detention Under the Bail Reform Act of 1984: An Empirical Analysis, 27 Am. Crim. L. Rev. 1, 15 (1989) ("Both in 1987 and in 1988 approximately 85 percent of all detainees were ultimately convicted of a criminal charge.").

[4]See, e.g., Stephanos Bibas, Plea Bargaining Outside the Shadow of Trial, 117 Harv. L. Rev. 2463, 2493 (2004) (noting that "[d]etained defendants find it harder to meet and strategize with their lawyers and to track down witnesses"); Marc Miller & Martin Guggenheim, Pretrial Detention and Punishment, 75 Minn. L. Rev. 335, 424 (1990) ("The differences in the ability of the defendant [released pretrial] to work, maintain a family life, and prepare for the defense of criminal charges are substantial.").

to limited visiting hours.⁵ The difficulty of preparing an adequate defense makes the likelihood of success at trial much lower for pretrial detainees than for those who have secured release and have avoided the stigma of a prison cell. ⁶ *Pretrial Detention and the Right to Be Monitored*, The Yale Law Journal, Volume 123, Number 5, March 2014, Samuel R. Wiseman

**THE BAIL REFORM ACT OF 1984**

Counsel for several of the co-defendants have included an expanded discussion of the Bail Reform Act of 1984 in their motions for release and I will not duplicate their efforts here. It is conceded that since Linwood Norman is charged with violating 18 U.S.C. § 924©, there exists a rebuttable presumption that "no condition of release, or combination of conditions, will reasonably assure the appearance of the defendant as required and the safety of other persons and the community." Mr. Norman carries the burden of production to come forward with evidence to rebut the presumption but that obligation does not shift the burden of persuasion to defendant which remains with the government." See United States v. Perry, 788 F.2d 100, 114 (3d Cir.1986) and United States v. Abdullahu, 488 F. Supp.2d 433, 438 (D.N.J. 2007). Instead, Mr. Linwood must present some "credible evidence forming the basis for his contention that he will appear [for court] and will not pose a threat to the community" to rebut the presumption. U.S. v. Carbone, 793 F.2d 559 (3ᵈ Cir. 1986).

---

⁵See Bibas, supra note 4, at 2493; Colbert, supra note 34, at 400 (noting that "people accused of crimes in the ten states that deny representation at the defendant's initial bail determination face delays, generally ranging from two to sixty days, before they obtain a lawyer's assistance"); Klein, supra note 44, at 293 & n.71 (noting that "prisoners, including pretrial detainees, may be incarcerated in facilities far away from the district in which they are tried," which "can inhibit a defense attorney from consulting with the pretrial detainee," and providing an extreme example of a defendant awaiting trial who was moved from New York to Texas.

⁶See, e.g., Malcolm M. Feeley, The Process Is the Punishment: Handling Cases in a Lower Criminal Court 205 (1979) (noting that even after controlling for the "seriousness of the offenses and other factors," pretrial "[d]etainees were less likely to receive nolles than were those who were released"); Cohen & Reaves, supra note 2, at 7 (in a survey of state pretrial release and detention in the seventy-five largest U.S. counties, finding that sixty percent of released defendants were later convicted as compared to seventy-eight percent of detained defendants); sources cited supra note 4.

Despite the government's allegations, Mr. Norman's innocence is still to be presumed as set forth in 18 U.S. C. § 3142(j) Presumption of Innocence which states that "Nothing in this section shall be construed as modifying or limiting the presumption of innocence."

"[A] defendant must be released on bail on the least restrictive condition or combination of conditions that will reasonably assure the defendant's appearance and the safety of the community." United States v. Abdullahu, 488 F. Supp.2d 433, 437 (D.N.J. 2007); 18 U.S.C. § 3142(c)(B).

The Court, under 3142(g), must evaluate the totality of the circumstances in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community. The Court must consider the available information concerning:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person, including;
> > (A) his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> > (B) whether, at the time of the current offense or arrest, he was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and,
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

In Linwood Norman's case, an evaluation of these factors strongly favors his release. The allegations are clearly more accurately described as thefts rather than crimes of violence; the evidence against Mr. Norman is almost entirely that of witnesses with criminal convictions and strong motives to lie (reduced or dropped criminal charges and civil suits). There are no confessions, audio recordings, video files or any other objective evidence to support the charges. The personal characteristics possessed by Mr. Norman as set forth in this filing describe a family man with significant ties to the community built over a lifetime spent here. He is not a flight risk.

Assuming that the allegations are true, Linwood Norman's dismissal as a police officer, has stripped him of the means (i.e., working under color of law) to commit the alleged crimes of which he is charged. Therefore, he is no longer a danger to commit same.

The evidence in this case is weak, the charges are overblown and the harm in permanently detaining Mr. Norman is great.

Finally, the criminal violation (924 © which is the basis of for triggering of the rebuttal presumption for permanent pretrial detention is totally absent from the charging document as to Linwood Norman. Further, no reasonable reading of the facts described in the indictment concerning the episodes in question could led one to believe that these thefts took place at gunpoint. ***The rebuttable presumption standard should not be applied to Linwood Norman's in this Pretrial Detention matter***.

**CONCLUSION**

The Government has failed to carry its burden and the detention motion should be denied. It is respectfully submitted that the Court can assure Mr. Norman's presence at trial and the safety of the community by setting reasonable conditions of pre-trial release.

**Respectfully submitted**,

*/s/ Nicholas V. Pinto*

**Nicholas V. Pinto**

**Attorney for Linwood Norman**

# **CERTIFICATE OF SERVICE**

I, Nicholas V. Pinto, being duly sworn according to law, hereby certify that a true and correct copy of this document was served upon the following individuals in the manner specified:

**Hon. Richard A. Lloret U.S. Magistrate Judge**
Eastern District of Pennsylvania
Robert N.C. Nix Federal Building
900 Market Street, Suite 219
Philadelphia, Pennsylvania  19107
**VIA ECF AND E-MAIL**

**Clerks Office**
**U.S. District Court, Eastern District of Pennsylvania**
2609 U.S. Courthouse
601 Market Street Philadelphia, Pennsylvania
19106-1797 **VIA ECF**

**Anthony J. Wzorek, Esquire**
**Assistant United States Attorney** Eastern District of Pennsylvania
615 Chestnut Street Suite 1250
Philadelphia, Pennsylvania  19106
**VIA ECF**

**Gregory J. Pagano, Esquire**
**Gregory J. Pagano, P.C.**
1315 Walnut St 12th Floor Philadelphia,
Pennsylvania 19107
**VIA ECF**

**Jack McMahon , Esquire**
**Law Office of Jack McMahon**
1500 Walnut Street Suite 1100 Philadelphia,
Pennsylvania 19102
**VIA ECF**

**James J. Binns, Esquire**
**James J. Binns, P.C.**
1818 Market Street Suite 3750
Philadelphia, Pennsylvania 19103
**VIA ECF**

*/s/ Nicholas V. Pinto*

**Nicholas V. Pinto**

**Attorney for Linwood Norman**